[No. A085271. First Dist., Div. Two. May 12, 2000.]

MARIO R. JUAREZ, Plaintiff and Appellant, v.
BOY SCOUTS OF AMERICA, INC., et al., Defendants and Respondents.

COUNSEL

Law Offices of Michael J. Kinane, Michael J. Kinane; Law Offices of Charles A. Bonner and Charles A. Bonner for Plaintiff and Appellant.

Sedgwick, Detert, Moran & Arnold and Nicholas W. Heldt for Defendants and Respondents Boy Scouts of America, Inc., and Boy Scouts of America, San Francisco Bay Area Council.

Tobin & Tobin, Paul E. Gaspari and Lawrence R. Jannuzzi for Defendant and Respondent The Roman Catholic Bishop of Oakland.

OPINION

RUVOLO, J.—

I.

INTRODUCTION

In 1996 appellant Mario R. Juarez (Juarez) sued respondents Boy Scouts of America, Inc. (BSA) and the San Francisco Bay Area Council (BAC) (collectively, the Scouts),[1] alleging that in 1990 when he was a member of Boy Scout Troop 255 (Troop 255), he was sexually molested by Jorge Francisco Paz (Paz), a scoutmaster of the troop. Juarez also sued Mary Help of Christians Church, a church of the Diocese of Oakland (the Church) where Troop 255 held its meetings. The trial court granted summary judgment in favor of the Scouts and the Church following the imposition of evidentiary sanctions conclusively establishing that no information was available to the Scouts or the Church that would cause any of them to suspect Paz had a propensity to molest children prior to the time he was accused of molesting Juarez.

Juarez appeals from the judgment dismissing his action, claiming the imposition of evidentiary sanctions was an abuse of discretion. Juarez also challenges the court's issuance of a protective order preventing discovery of

---

[1] Although for purposes of this opinion we find it practical to refer to the BAC and the BSA collectively, we are aware they are separate entities. To carry out its programs in certain geographical activities, the BSA charters local councils, like the BAC, which are granted jurisdiction over a prescribed geographical area. Approximately 400 local councils in the United States hold charters from the BSA. Neither the BSA nor the BAC operates any scout troops. Scout troops are operated by local organizations such as a PTA or a church. In this case, Boy Scout Troop 255 was sponsored in 1987 through 1989 by Lazear School Advisory Council and in 1990 by the Church.

certain confidential records maintained by the Scouts. As his final contention, Juarez maintains that even if the trial court's discovery rulings are upheld on appeal, he has submitted sufficient evidence to raise a triable issue of fact with respect to the Scouts's alleged negligence in selecting, supervising, and retaining Paz. He also claims the Scouts owed and breached a duty to take reasonable measures to protect him from sexual assault. He seeks to maintain his lawsuit against the Church on every cause of action alleged against the Scouts, including an additional one for premises liability.

We affirm the trial court's discovery sanction and issuance of a protective order. We further conclude the trial court properly granted summary judgment on all of Juarez's causes of action except one. The only viable cause of action is premised on the theory that the Scouts failed to take reasonable measures to protect Juarez from sexual molestation by Paz. We conclude such a legal duty was owed to Juarez, and that the record adduced on summary judgment has raised triable issues of fact as to whether the duty of care was breached and caused harm to Juarez. Consequently, we reverse summary judgement as to this claim and allow it to proceed solely against the Scouts.

## II.

### FACTS AND PROCEDURAL HISTORY

Juarez, now an adult, sued the Scouts and the Church on May 17, 1996, alleging that while a member of Troop 255 in Oakland he was repeatedly sexually molested by Paz. According to Juarez, the molestations occurred in 1990 when he was between 12 and 13 years old. The sexual acts were committed during officially sanctioned scouting events, such as overnight camping trips, and at Paz's home. However, Juarez did not reveal the molestations to anyone until 1993. After Juarez's revelations, Paz gave a statement to law enforcement authorities admitting he had engaged in sexual misconduct with Juarez as well as with numerous other minors. Paz was ultimately sentenced to 14 years in prison on the basis of a negotiated plea.

Juarez's complaint contained causes of action based on breach of fiduciary duty, various forms of negligence, and intentional infliction of emotional distress. An additional cause of action was stated against the Church for premises liability. Juarez alleged that the Scouts and the Church were responsible for the damages he sustained as the result of Paz's actions. Juarez specifically claimed the Scouts and the Church were negligent in: (1) hiring Paz without conducting a proper background check; (2) failing to monitor and supervise him so that young male scouts would be protected

from sexual molestation; (3) failing to properly manage, oversee, and educate Troop 255; and (4) doing nothing to stop Paz from engaging in inappropriate sexual conduct with young male scouts even after they knew or should have known of his deviant propensities.

Paz was Juarez's scoutmaster for less than a year, from February 1990 until December 1990. The troop ceased to exist in January 1991. At the time Paz became a scoutmaster he had been employed by the Oakland Unified School District as an instructional aide for 18 years without incident. Moreover, there is nothing in the record indicating Paz had a prior criminal record or documented history of sexual misconduct. Nor did anything become known during Paz's service as assistant scoutmaster that should have raised questions about his fitness for that position.

On January 23, 1998, the trial court issued discovery sanctions for Juarez's misuse of the discovery process and repeated violation of court orders. According to the court's order, the following pertinent facts were "conclusively established in this case: [¶] 1. No reports or accusations of child molestation were made against Jorge Francisco Paz before he molested Mario Roberto Juarez. [¶] 2. No information was accessible to Boy Scouts of America, to the San Francisco Bay Area Council, Boy Scouts of America, Inc., or to the Roman Catholic Bishop of Oakland that would cause any of them to suspect that Jorge Francisco Paz had a propensity to molest children before he was accused in 1993 of molesting Mario Roberto Juarez."

On March 2, 1998, the Church and the Scouts brought their respective motions for summary judgment or alternatively for summary adjudication. Although they raised many arguments, only one concerns us. The Church and the Scouts contended there were no genuine issues of material fact in dispute regarding their lack of prior knowledge or reason to know that Paz might be likely to sexually molest one of the scouts in Troop 255. They argued that, because the undisputed facts established that Paz's sexual misconduct with Juarez could not have been foreseen, they were entitled to judgment as a matter of law.

The court granted the motions for summary judgment on September 24, 1998. The court found, among other things, that Juarez had failed "to raise a triable issue of fact suggesting that defendants had notice of Paz's propensities, or that facts providing such notice were available to defendants." The court also found "none of plaintiff's additional facts . . . demonstrate that defendants had any notice of Paz's propensities, or that facts providing such notice were available to defendants." "[B]ecause Paz's propensity to molest children was not discoverable before Paz molested plaintiff," the "inadequacy of background investigation, supervision, training, or management of

property" was not a legal cause of harm to Juarez. Notice of appeal of the judgments and the discovery orders was filed on November 23, 1998.

## III.

### DISCUSSION

A. *Interlocutory Discovery Rulings*

On April 4, 1997, nearly a year after the complaint was filed, interrogatories and document requests were served upon Juarez. Among those requests were specific questions concerning whether Juarez had evidence of any complaints that had been made about Paz before Juarez was abused; whether he contended the Church and the Scouts should have known of any abuse; and what facts, evidence, and witnesses he had supporting such a claim.

Juarez did not respond to these requests at all. A motion to compel followed on May 13, 1997, and only then, prior to hearing, did Juarez provide responses. Those responses consisted of objections, nonspecific incorporations of other information, and a long ephemeral statement simply reiterating the allegations made in the complaint. The responses also included many objections on the grounds of attorney-client and work product privileges.[2] The motion to compel was granted on June 13, 1997, and the court awarded monetary sanctions against Juarez in the amount of $464.

Juarez filed additional responses that added no new information, except what was already produced. The responses did not identify any particular documents or other evidence or witnesses, and again they did not identify or produce the documentary basis for what little information was provided.

On August 18, 1997, on another motion to compel, the trial court entered its order deeming Juarez's responses to interrogatories and document requests inadequate and requiring Juarez to provide further responses. Monetary sanctions were once again awarded in the amount of $494. In addition, the court specifically ordered Juarez to identify which documents were responsive to the requests; to produce copies of them; and if they were

---

[2]For example, when asked whether complaints had been made against Paz before he became a scoutmaster, Juarez provided the following: 1) objections; 2) incorporation of the "answers as provided in his deposition"; 3) incorporation of the "facts contained in his complaint"; 4) incorporation of the "responses to previous interrogatories"; 5) incorporation of the "facts contained in documents previously provided"; and 6) a list of names and addresses of persons Juarez "believes" had been subject to sexual abuse before he himself was.

commercially published documents, ordered Juarez to designate the specific pages out of the mass of discovery material that he believed were responsive to the discovery requests. The court found that Juarez had failed to make timely and specific objections to the discovery requests, thereby waiving any objection except the attorney-client privilege or privacy objections. Additionally, the court ordered that if any material was being withheld on the basis of privilege, Juarez must provide a "privilege log."

In response to this order, Juarez provided a third set of responses but those responses were substantively identical to the responses before the court that had already been found to be inadequate. The Scouts filed a motion to dismiss the complaint or to impose other sanctions because of Juarez's repeated failure to comply with discovery orders. In this motion, the Scouts argued that Juarez had been guilty of a protracted course of "ignoring discovery requests, ignoring court orders, and defiance of court orders." On January 23, 1998, the trial court entered its order imposing issue and evidence preclusion sanctions for failure to comply with the trial court's earlier orders. On January 29, 1998, the trial court denied Juarez's first motion for reconsideration. On March 30, 1998, the trial court denied his second motion for reconsideration, clarifying the prior order without disturbing the sanctions.

Clearly, in this case there was ample evidence of Juarez's misuse of the discovery process. Such misuse and abuse included repeated instances of violation of court orders, and on several occasions, imposition of monetary sanctions. Juarez's pattern of discovery abuse justified the court's imposition of sanctions as delineated in Code of Civil Procedure section 2023. Our Supreme Court recently examined the broad range of sanctions set out in that statute for a misuse of the discovery process: "The sanctions under Code of Civil Procedure section 2023 are potent. They include monetary sanctions, contempt sanctions, issue sanctions ordering that designated facts be taken as established or precluding the offending party from supporting or opposing designated claims or defenses, evidence sanctions prohibiting the offending party from introducing designated matters into evidence, and terminating sanctions that include striking part or all of the pleadings, dismissing part or all of the action, or granting a default judgment against the offending party." (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12 [74 Cal.Rptr.2d 248, 954 P.2d 511].) "In choosing among its various options for imposing a discovery sanction, a trial court exercises discretion, subject to reversal only for manifest abuse exceeding the bounds of reason. [Citation.])" (*Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 988 [10 Cal.Rptr.2d 773]; see also *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545 [51 Cal.Rptr.2d 311] [discovery sanctions

reversible only for arbitrary, capricious, or whimsical action]; *Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 431-432 [79 Cal.Rptr.2d 62] [complaining party must show how and why court's action constituted abuse of discretion].)

Juarez contends the court abused its discretion in imposing the evidence preclusion sanction in this case on the ground that it was "arbitrary, capricious, and punitive, as there was no willful disobedience or [*sic*] the court's order and no harm to defendants." We disagree. We are convinced that the court's actions in this case—though certainly drastic—fall within the bounds of permissible discretion. Contrary to Juarez's assertion, the evidence preclusion sanction was not punitive. Rather, "[i]n choosing this sanction, the court was attempting to tailor the sanction to the harm caused by the withheld discovery. [Citation.]" (*Sauer v. Superior Court* (1987) 195 Cal.App.3d 213, 229 [240 Cal.Rptr. 489].) In imposing an evidence preclusion sanction, the trial court simply prohibited Juarez from producing at trial the evidence that he repeatedly refused to produce during discovery.

The purpose of the discovery rules is to "enhance the truth-seeking function of the litigation process and eliminate trial strategies that focus on gamesmanship and surprise." (*Williams v. Volkswagenwerk Aktiengesellschaft* (1986) 180 Cal.App.3d 1244, 1254 [226 Cal.Rptr. 306].) In other words, the discovery process is designed to " 'make a trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.' " (*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 376 [15 Cal.Rptr. 90, 364 P.2d 266].)

"An important aspect of legitimate discovery from a defendant's point of view is the ascertainment, in advance of trial, of the specific components of plaintiff's case so that appropriate preparations can be made to meet them. It is impossible to discover this other than from the plaintiff." (*Karz v. Karl* (1982) 137 Cal.App.3d 637, 650 [187 Cal.Rptr. 183].)

Appropriate written interrogatories are one of the means to accomplish the general goals of the discovery process designed to facilitate a fair trial. The discovery requests at issue required Juarez to produce some form of tangible information, such as a documented history of sexual misconduct in Paz's background or a report of wrongdoing while involved with Troop 255, which would have put the Scouts and the Church on notice that Paz was predisposed toward the misconduct in issue. Without question, the evidence Juarez sought to suppress by his series of nonresponsive and evasive answers was vital to the Scouts and the Church in preparing their defenses. After all, Juarez had alleged in his complaint that the Scouts and the Church "were

negligent and careless in that they knew or should have known, but did nothing about the fact that PAZ was incompetent, immoral, irresponsible, emotionally disturbed, a pedophile, and was likely to sexually molest and commit lewd and lascivious acts upon JUAREZ . . . ." From the record before us, the trial court was fully justified in concluding that Juarez deliberately engaged in uncooperative and obstructive tactics in resisting the defending parties' legitimate efforts to unearth the facts supporting such serious allegations.

Absent some unusual extenuating circumstances not present here, the appropriate sanction when a party repeatedly and willfully fails to provide certain evidence to the opposing party as required by the discovery rules is preclusion of that evidence from the trial—even if such a sanction proves determinative in terminating plaintiff's case. (See cases discussed in *Karz v. Karl, supra,* 137 Cal.App.3d at pp. 648-649 [upholding sanctions precluding plaintiff from proving essential elements of his causes of action after plaintiff failed to comply with an order compelling him to provide further answers to interrogatories].) "The *ratio decidendi* behind such cases," a court has stated, is "that a persistent refusal to comply with an order for the production of evidence is tantamount to an admission that the disobedient party really has no meritorious claim . . . ." (*Kahn v. Kahn* (1977) 68 Cal.App.3d 372, 382 [137 Cal.Rptr. 332].) No abuse of discretion has been shown.

■ We next address Juarez's challenge to a protective order made on April, 9, 1998, denying Juarez discovery of "ineligible volunteer files" kept by the Scouts. The ineligible volunteer files, also known as the "confidential files," are the records maintained by the Scouts (1) to identify individuals who have been determined to be "unfit" in case they try to register as scouting volunteers in the future; and (2) to document information as to why an individual was declared ineligible in the event he should challenge that determination. Not all of the adult volunteers who have been declared unsuitable have been found guilty of sexual misconduct—some have allegedly committed other types misconduct, such as financial wrongdoing and criminal behavior.

During discovery, at Juarez's request, the Scouts produced the ineligible volunteer file assembled for Paz in 1994 after Juarez's allegations came to light. However, the Scouts filed a motion for a protective order concerning the ineligible volunteer files containing information about persons entirely unrelated to this case. In support of this motion, the Scouts argued that the ineligible volunteer files were protected by the constitutional right of privacy and that no compelling need had been shown for the discovery of these constitutionally protected files.

In response to the Scouts's motion for a protective order, the court appointed a referee to conduct an in camera review of certain ineligible volunteer records maintained by the Scouts. The files were redacted by elimination of the name, address, phone number, birth date, and Social Security number of each individual who was the subject of these files. The purpose of the referee's in camera review was to determine the discoverability of those files. After reviewing the redacted sample of files, the referee concluded "[t]hese files contain private information and are the type of files that are subject to protection by the right of privacy." The referee further recommended that Juarez be provided with "five fully redacted exemplar files," selected by the referee, for the purpose of presenting arguments, if Juarez could, that the contents of the files were relevant to the issues in this case, and that Juarez had such a compelling need for the information that it would outweigh the right of privacy.

By order dated November 7, 1997, the court adopted the referee's recommendations; and on December 6, 1997, the referee delivered to Juarez five redacted exemplar files from the ineligible volunteer files that had been presented for in camera review. For approximately two months thereafter, Juarez made no effort to present any argument to the referee or the court to demonstrate the discoverability of the files. Therefore, on January 30, 1998, the Scouts submitted a motion to the referee requesting a finding that Juarez had failed to show a basis for discovery of the files and requesting that a protective order be entered. Juarez responded, claiming the Scouts's motion was premature. In any event, Juarez made a futile attempt to show how the information contained in the exemplar files was relevant to the issues in this case.

On April 9, 1998, the court adopted the recommendations of the discovery referee and entered a protective order prohibiting the ineligible volunteer files from being produced in discovery. This protective order states, in part: "The court has found by its Order filed November 7, 1997 that the 'Ineligible Volunteer Files' contain private information and are the type of files that are subject to protection by the right of privacy. [¶] . . . [P]laintiff has not shown that the contents of the 'Ineligible Volunteer Files,' other than the file relating to Jorge Francisco Paz, who is a defendant in this case, is directly relevant to any issue in this case or that plaintiff has a compelling need for the production of these files."

Juarez has never disputed that the information contained in the ineligible volunteer files falls manifestly within the Constitution's protected area of privacy. (Cal. Const., art. I, § 1.) This is in recognition, no doubt, that such an argument would be futile. Clearly, these files relate to the most private

affairs of various individuals unrelated to this litigation and were maintained in strictest confidence by the Scouts. Because the requested material is constitutionally protected, the ordinary yardstick for discoverability, i.e., that the information sought may lead to relevant evidence, is inapplicable. (*Kahn v. Superior Court* (1987) 188 Cal.App.3d 752, 766 [233 Cal.Rptr. 662].) Moreover, it is not enough to show the matters encompassed by the right of privacy are merely relevant to the issues of ongoing litigation. There must be a careful balancing of the *compelling public need* for discovery against the fundamental right of privacy. (*Ibid.*; *Binder v. Superior Court* (1987) 196 Cal.App.3d 893, 900 [242 Cal.Rptr. 231].)

Juarez's sole argument purporting to establish his compelling need for the information in the ineligible volunteer files is as follows: "[T]he extensive 'ineligible volunteer file[s],' which document those scout masters who have been kicked out for molesting boy scouts, provid[e] knowledge of the rampant risk of pedophiles entering the Boy Scouts and molesting vulnerable Boy Scouts."

In our view, Juarez has not shown that the information contained in the ineligible volunteer files is directly relevant to any *disputed* issue in this case; let alone, that there is a compelling need for this information that outweighs the right to privacy. The Scouts admitted in response to Juarez's request for admissions that the Scouts knew molestation could occur and did occur between scoutmasters and scouts before Juarez was molested. In 1987, prior to the alleged molestation in this case, the Scouts implemented a "Youth Protection Program" intended to minimize the potential of sexual abuse within scouting programs. Consequently, Juarez has failed to show there was a compelling need for disclosure of this information that would outweigh the right of privacy of many individuals who are not parties to this lawsuit.

## B. *Grant of Summary Judgment*

### 1. Standard of Review

Juarez contends that, even if the trial court's interlocutory discovery rulings are upheld on appeal, summary judgment was erroneously granted to the Church and the Scouts. Relying on an array of theories of tort liability, he argues he submitted sufficient evidence in opposition to summary judgment to establish duties of care owed to him and to raise triable issues of fact with respect to whether the Church and the Scouts breached these duties and legally caused his injuries.

Under the summary judgment statute, Code of Civil Procedure section 437c, the defendant meets its burden of showing that a cause of action has no

merit if it shows "that one or more elements of the cause of action, . . . cannot be established, or that there is a complete defense to that cause of action. *Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . .* to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. *The plaintiff . . .* may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, *shall set forth the specific facts showing that a triable issue of material fact exists* as to that cause of action or a defense thereto." (Code Civil Proc., § 437c, subd. (o)(2), italics added.)

■ "We review the trial court's ruling on respondent's motion for summary judgment under the independent review standard. An appellate court must independently determine the construction and effect of the facts presented to the trial judge as a matter of law. [Citations.]" (*Rosse v. DeSoto Cab Co.* (1995) 34 Cal.App.4th 1047, 1050 [40 Cal.Rptr.2d 680].)

The sanction imposed by the trial court, which we have upheld in the preceding part of this opinion, precluded Juarez from introducing *any evidence* designed to prove that prior to 1993, the Scouts or the Church either had or should have had knowledge or notice of Paz's propensity toward sexual misconduct with boys. The remaining question is whether Juarez's inability to present any particularized evidence regarding Paz is fatal to all of his pleaded theories of liability against the Church and the Scouts. We discuss those pleaded theories in turn below.

2. Liability Based on Respondeat Superior

■ First, we reject Juarez's claims based on the doctrine of respondeat superior, or its more common name, vicarious liability, which would impute negligence to the Scouts and the Church for intentional sexual molestation by one of its volunteers. Juarez argues that, because volunteer scout leaders are invariably placed in authoritative positions of trust—situations that heighten the vulnerability of the boys entrusted to their care—the Scouts and the Church should be found vicariously liable for Paz's sexual misconduct under the doctrine of respondeat superior.

■ The doctrine of respondeat superior is an exception to the general rule that liability follows fault. Respondeat superior generally imposes liability on an employer when its employee engages in tortious conduct while acting within the course and scope of employment. In such cases, the faultless employer may be held vicariously liable for the employee's actions on the theory that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities. (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208 [285 Cal.Rptr. 99,

814 P.2d 1341].) The employer's liability thus extends beyond the employer's actual or possible control of the employee to include risks inherent in or created by the enterprise. (*Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967 [227 Cal.Rptr. 106, 719 P.2d 676].) It follows, in part, that a plaintiff seeking to impose liability on a theory of respondeat superior must show that the employee's tortious conduct was committed within the course and scope of employment. (*Mary M. v. City of Los Angeles*, supra, 54 Cal.3d at p. 209.)

We conclude that imposing such a sweeping doctrine as respondeat superior under the facts of this case would be contrary to the guidance provided by a number of cases that have consistently held that under the doctrine of respondeat superior, sexual misconduct falls outside the course and scope of employment and should not be imputed to the employer.[3] (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291 [48 Cal.Rptr.2d 510, 907 P.2d 358] [hospital not liable under doctrine of respondeat superior for technician's sexual assault of patient]; *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438 [256 Cal.Rptr. 766, 769 P.2d 948] [school district not vicariously liable under doctrine of respondeat superior for molestation by teacher]; *Jeffrey E. v. Central Baptist Church* (1988) 197 Cal.App.3d 718, 722 [243 Cal.Rptr. 128] [church not liable under respondeat superior for molestation of student by Sunday school teacher]; *Alma W. v. Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 139-142 [176 Cal.Rptr. 287] [school district not vicariously liable for rape of student by janitor].) In line with this authority, the California Supreme Court has held that an employer has no obligation to indemnify a sexual harasser, even though the acts occurred during work hours on the employer's premises. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992 [47 Cal.Rptr.2d 478, 906 P.2d 440] (*Farmers*).)

Moreover, the fact that Paz's position as scoutmaster placed him in a position of authority over Juarez fails to aid Juarez in this context. In *Farmers*, our Supreme Court disavowed the proposition "that an employer may be vicariously liable for an employee's misconduct whenever there is an abuse of a job-created, hierarchical relationship in which the employee is afforded a high degree of authority over the victim." (*Farmers*, supra, 11 Cal.4th at p. 1012.) The court went on to endorse "cases rejecting the application of respondeat superior for misconduct occurring in relationships of a hierarchical nature where, at least in the eyes of the victim, the wrongdoer's authority might be considered very great. [Citations.]" (*Id.* at p.

---

[3]For purposes of this discussion on respondeat superior, we assume without deciding that Paz was an agent/employee of the Scouts during the time he served as scoutmaster in Troop 255, a fact that is sharply contested by the Scouts in this case.

1013.) The court further held that, "for purposes of respondeat superior, employees do not act within the scope of employment when they abuse job-created authority over others for purely personal reasons." (*Ibid.*)

Like the *Farmers* court, we reject the proposition that simply because the scoutmaster/scouting relationship provided the opportunity for Paz's wrongful acts, Paz's intentional criminal actions should be imputed to the Scouts and the Church. Rather, the imposition of tort liability for a third party's sexual misconduct requires that direct negligence be established. Therefore, we agree with the trial court that under the undisputed facts of this case, and as a matter of law, the theory of respondeat superior is not applicable to hold the Church and the Scouts vicariously liable for Paz's acts of sexual molestation.

3. Negligent Hiring/Selection of Paz

 In proceedings below, Juarez proffered the alternative theory that the Scouts were liable for its negligence in the selection, supervision and retention of Paz.[4] The conclusive determination that there was no information accessible to the Scouts that would cause them to suspect that Paz had a propensity to molest children is fatal to Juarez's causes of action based on these theories, even if such a common law duty existed.[5]

"[I]n California, an employer can be held liable for negligent hiring if he knows the employee is unfit, or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness before hiring him. [Citations.]" (*Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 843 [10 Cal.Rptr.2d 748].) "[T]he theory of negligent hiring here encompasses the *particular risk of molestation by an employee* with a history of this specific conduct." (*Id.* at p. 837.) Furthermore, there can be no liability for negligent supervision "in the absence of knowledge by the principal that the agent or servant was a person who could not be trusted to act properly without being supervised." (*Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 664 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164].)

These principles are illustrated by *Roman Catholic Bishop v. Superior Court* (1996) 42 Cal.App.4th 1556 [50 Cal.Rptr.2d 399]. There, a victim of childhood sexual abuse sued the church for negligent hiring, supervision,

---

[4]The Church's liability under Juarez's theories of direct negligence, including premises liability, will be discussed in a later part of this opinion.

[5]For purposes of this discussion, we assume without deciding that a duty was owed to Juarez by the Scouts and the Church to use due care in selecting, retaining, and supervising the scoutmasters for Troop 255. (See generally Notes, *Just Perfect for Pedophiles? Charitable Organizations That Work with Children and Their Duty to Screen Volunteers* (1997) 76 Tex. L.Rev. 143 (hereafter *Perfect for Pedophiles?*).)

and retention, claiming that the church should have known of the sexual propensities of a parish priest. Her action was properly dismissed on summary judgment because she could not prove that the church had any basis upon which to suspect that the priest had deviant tendencies. (*Id.* at pp. 1565-1567.)

Similarly, in *Federico v. Superior Court* (1997) 59 Cal.App.4th 1207 [69 Cal.Rptr.2d 370], a hairstyling school could not be found liable under a negligent hiring theory for an employee's molestation of a minor where there was nothing that would have indicated the employee posed a threat of harm to minors he might encounter in the course of the work he was hired to perform. Consequently, "as a matter of law, hiring [the employee] did not constitute a breach of defendant's limited duty to exercise reasonable care in his selection of employees." (*Id.* at p. 1213.) The appellate court also held the minor's cause of action based on negligent supervision should have been disposed of by summary judgment. While the record contained evidence of the employee's conduct at work which, in hindsight, could have been indicative of the employee's "deviant sexual proclivities," such conduct "did not result in any complaints to [the employer] by the children involved or their parents." (*Id.* at p. 1216.) Thus, they could not be used to impose liability for negligent supervision on the employer, who had no actual knowledge or reason to suspect these incidents had occurred. (*Ibid.*)[6]

In *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 [46 Cal.Rptr.2d 73], a family friend alleged she was repeatedly sexually abused as a minor when she was visiting in the alleged abuser's home. She sought to hold the wife of the alleged abuser liable under a theory of negligent supervision. The appellate court found the wife's demurrer should have been sustained because the facts alleged, standing alone, were insufficient to show that the wife had knowledge of her husband's deviant propensities such that it would cause her to take measures to prevent the alleged sexual abuse. The court held: "It is not enough to allege that the sexual misconduct was *conceivable*. [Citation.] The plaintiff must allege facts showing that it was *foreseeable*, i.e., facts from which it can be inferred that the wife *must have known* that her husband was engaging in, or wished to engage in, acts of sexual misconduct with a minor." (*Id.* at p. 158.)

[6]In Juarez's opposition to summary judgment he tenders evidence, like the evidence in *Federico* which, in hindsight, could have been indicative of Paz's "deviant sexual proclivities." (59 Cal.App.4th at p. 1216.) These factual events include Paz entertaining members of Troop 255 at his home and the alleged suspicion of one of his neighbors that something untoward was going on. However, as in *Federico*, it is undisputed that none of these incidents resulted in any complaints or reports being made to the Scouts that would have alerted them that Paz's continued retention as a scoutmaster might pose an unreasonable risk of harm to minors.

While the undisputed facts show with certainty that Juarez was seriously harmed by Paz's misconduct, those same undisputed facts establish that there was nothing in Paz's background and nothing that was made known to the Scouts during his tenure as scoutmaster to Troop 255 that could be deemed a specific warning that Paz himself posed an unreasonable risk to minors. Therefore, we affirm the trial court's grant of summary judgment on the causes of action for negligent hiring, retention and supervision.

4. Liability Based on Theory Scouts Had Duty to Take Reasonable Protective Measures

a. *General Considerations*

 Distinct from theories based on the Scouts's alleged negligence in selecting, supervising, and retaining Paz, Juarez's complaint also contains a claim implicating the Scouts's independent responsibility to protect and educate the young men who participate in their programs. The complaint contains an allegation that "[The Scouts] negligently . . . taught, educated, secured oversaw and maintained Troop . . . 255 and all of the Boy Scouts therein, including [Juarez]." There is evidence in this case that Juarez was repeatedly molested by his scoutmaster, Paz, and that numerous incidents took place during officially sanctioned scouting events, such as overnight campouts. Juarez theorizes that if the adult leaders in his troop had received training on how to prevent and detect sexual abuse, and if he had been warned and educated about how to handle such a situation, the sexual molestations would have been prevented.

The definition and scope of such a duty have been the subject of post-oral-argument supplemental briefing in which the parties have been asked to address "what, if any, legal duty" the Scouts had "to warn, train or educate [Juarez] (either directly or through his parent) about the risk of sexual abuse by adult male volunteers involved in the scouting program, and how to avoid or minimize such risk." After considering the supplemental briefs and the record, we reject the Scouts's threshold contention that this theory of liability was not fully developed or factually presented to the trial court and therefore cannot be considered on appeal. (*Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 985 [263 Cal.Rptr. 878].) A defendant is not entitled to summary judgment unless that moving party negates all theories of liability pleaded by the plaintiff. (*Lopez v. Superior Court* (1996) 45 Cal.App.4th 705, 717 [52 Cal.Rptr.2d 821].)

b. *Record Evidence Relevant to the Theory of Liability*

 The summary judgment evidence supporting this theory includes the following: Juarez joined Troop 255 in Oakland when he was 12 years

old. At the time, he had recently emigrated with his mother from Honduras, where he had participated in the Scouts. Juarez's mother encouraged his participation in scouting because his father was deceased, and she thought the Boy Scouts would provide good male role models.

In the 1980's, the Scouts identified child abuse, including sexual abuse, as one of five social "unacceptables," along with drug abuse, hunger, illiteracy, and unemployment. As such, the Scouts established the protection of our nation's youth from sexual abuse as a priority for the use of its resources. The Scouts, therefore, developed a comprehensive "Youth Protection Program" designed to educate adult volunteers, parents and the scouts themselves to aid in the detection and prevention of sexual molestation by volunteers associated with scouting.

For example, in 1987 the Scouts developed a training program entitled "Youth Protection Guidelines, Training for Volunteers, Camp Staff, and Parents" (Youth Protection Guidelines), which consisted of written handout materials and a videotape presentation. All paid employees of the Scouts were required to participate in this training program. The record is silent as to what steps were taken, if any, to require volunteers at the local troop level to undergo this training program.

As part of its Youth Protection Program, the Scouts also produced a 29-minute educational video aimed at boys aged 10 to 14 entitled, "A Time to Tell." The video features three adolescent boys dramatizing situations in which men have attempted to abuse them. The film stresses "the three R's" of youth protection—recognize, resist and report. The video tells viewers that resistance will stop most molestations, since very few molesters will resort to force. At the end of the presentation, the toll-free number of the National Child Abuse Hotline is presented for viewers who may need help but do not know where to turn. Sex abuse experts have called A Time to Tell "perhaps the best tool they've seen for teaching children about sex abuse." (Boyle, Scout's Honor: Sexual Abuse in America's Most Trusted Institution (1994) p. 309 (Scout's Honor).)[7] At oral argument, it was explained that all local councils of the Scouts are provided with copies of this videotape and a local troop may borrow it for viewing. While the Scouts encourage scouting leaders to show this film to local troops, there is no requirement that they do so. This video was never shown to or discussed with Troop 255.

---

[7]While the Scouts interposed a hearsay objection to the use of the material in Scout's Honor, there is no indication the court ruled on this objection. Because trial counsel did not obtain a ruling on the objection, it is waived and is not preserved on appeal. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*).)

It is undisputed that as part of his orientation into the Scouts's program, Juarez received a copy of the Boy Scout Handbook. This handbook contains a 24-page removable pamphlet, "How to Protect Your Children from Child Abuse and Drug Abuse: A Parent's Guide." Among other things, the pamphlet tells parents how to explain when boys should violate part of the "Scout Law." It states: "[A] Scout does not have to obey an adult when that person tells him to do something that the Scout feels is wrong or that makes the Scout feel uncomfortable." The handbook states a molester can be "a schoolteacher, religious leader, or youth group leader." It tells the boys, "Molesters look for victims who do not know enough to resist the abuse. You have the right to control your body. Anytime a person does something to your body that makes you feel bad or you know is wrong, you have the right to stop them even if you must be rude. You should be ready to run, scream, or make a scene in public in order to protect yourself. When faced with resistance, most molesters will stop." Parents are given "protective strategies designed to give youth the power to protect themselves."

Although the handbook is available in Spanish, Juarez's Boy Scout Handbook was the English version, and there is no indication he was informed that a Spanish language version was available. Juarez has filed a declaration in this matter stating: "When I joined the Boy Scouts of America, Troop 255, I did not speak, read, nor write English. I was issued the Boy Scout Handbook in English. I was never given a copy of the Boy Scout Handbook in my native language of Spanish. I spoke Spanish 100% of the time during my membership in the Boy Scouts . . . . The boys in Troop 255 were all Hispanic and all had very little English speaking skills and we, too, conversed in Spanish at least 90% of the time." Like Juarez, most of the members of Troop 255 were recent immigrants to this country and were unfamiliar with its language and customs. Juarez's mother filed a declaration in this matter stating: "I did see his handbook laying around the house, but, because it was in English, I never picked it up and attempted to read it. I did not know the book contained any information for me as a parent to be aware of. I was never shown, or informed of, a Boy Scout Handbook in Spanish. My son did not have a Boy Scout Handbook in Spanish."

Juarez's declaration further states: "No one from [the Scouts] ever talked to me or other Boy Scouts in my presence about how to protect ourselves from sexual molestation from our Scout Master. I was never sexually abused in the Scouts in Honduras nor had I heard of such conduct and did not know the proper responses to repel and rebuff my Scout Master's illegal sexual advances."

The Scouts presented evidence that Jorge Aguilar, who was a member of the troop committee of Troop 255 during the time Juarez was a member,

received training from the Scouts on the subject of detecting and preventing child abuse. However, Aguilar's declaration states that he was an "active leader" of Troop 255 only until the end of 1988, and that he did not renew his registration as an adult leader in 1989. When Aguilar was deposed, he admitted he had only "minimum contact" with Troop 255 in 1990 while Juarez was a member, and he did not personally observe Paz interacting with the scouts in Troop 255. Additionally, Aguilar testified that he did not go on any Troop 255 camping trips, he did not participate in troop meetings, nor did he supervise the activities of Troop 255 during the time Juarez was a member of the troop.

Jose Robles agreed to become an adult leader (scoutmaster) for Troop 255 in January 1990, and continued to serve for the remaining time the troop existed. Robles testified in his deposition that he never received any abuse prevention training from the Scouts nor had he heard of the video, A Time to Tell. He recalled that he was given no literature or publications from the Scouts, other than his child's Boy Scout Handbook, and "at no time did I receive any information in Spanish." He also stated that he never met a representative from the Scouts during his tenure as scoutmaster and that he and Paz were the "only ones that were there." Robles confirmed there were occasions when Paz would sleep in the same tent with scouts on camping trips, and there were some camping trips where Paz was the only adult who went with the troop. These occurrences were in direct violation of the Scout's Youth Protection Guidelines, which prohibit an adult from sleeping in a tent with an unrelated scout and mandate that two adults must be present at every scout activity. Robles testified he was never informed of these rules.

Relying on this evidence, Juarez contended in summary judgment proceedings below that he had offered "disputed and compelling evidence that the Rules and Policies of the Boy Scouts of America, Inc. were not implemented at [T]roop []255, not understood by the primarily Spanish speaking parents, youth and troop leaders, and were completely ineffective at protecting Mario Juarez from sexual molestation by Paz." (Fn. omitted.) Juarez argued that "if the members of [T]roop 255 . . . had been effectively educated and trained to recognize indicators of pedophile activities," they would have "recognized suspicious activity" by Paz, such as sleeping with scouts in their tents on overnight camping trips and having scouts spend the night at his apartment. Furthermore, education and training of the scouts as to how to "repel" adult sexual advances would have prevented the molestations.

c. *Analysis of Factors Affecting Duty—Rowland v. Christian*

" 'A tort . . . involves a violation of a legal duty, imposed by statute, contract or otherwise, owed by the defendant to the person injured.

Without such a duty, any injury is "damnum absque injuria"—injury without wrong. [Citations.]' [Citation.] Thus, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury. [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292-293 [253 Cal.Rptr. 97, 763 P.2d 948], italics omitted.) "Duty, being a question of law, is particularly amenable to resolution by summary judgment. [Citation.]" (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 465 [63 Cal.Rptr.2d 291, 936 P.2d 70](*Parsons*); see also *Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; *Nola M. v. University of Southern California* (1993) 16 Cal.App.4th 421, 426 [20 Cal.Rptr.2d 97].)

Since its publication in 1968, the seminal case of *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*), has stood as the gold standard against which the imposition of common law tort liability in California is weighed by the courts in this state. Of that important case, we said recently in *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243 [80 Cal.Rptr.2d 196] (*Adams*): "Since *Rowland* was decided, its innumerable judicial descendants have adopted the *Rowland* court's multi-element duty assessment in determining whether a particular defendant owed a tort duty to a given plaintiff. These factors include: (1) the foreseeability of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability. (*Rowland, supra*, 69 Cal.2d at pp. 112-113.)" (*Adams, supra*, 68 Cal.App.4th at pp. 267-268, fn. omitted.)[8]

The goal of applying the *Rowland* factors has been described as the ascertainment of whether "the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard v. Uribe, supra*, 41 Cal.3d at pp. 572-573, fn. 6.) Recently, in *Parsons, supra*, 15 Cal.4th 456, our Supreme Court reaffirmed its dedication to a public-policy-driven analysis for defining common law duty when it commented on *Rowland* and its multi-elemental analysis in the following manner: " ' "[D]uty" is not an

---

[8]Where public entities are defendants, the courts will consider additional factors of whether there is liability insurance available to protect the public entity against the financial burden of imposing a duty, the extent of the agency's powers, the role imposed on it by law, and limitations imposed on the agency by budget. (*Adams, supra*, 68 Cal.App.4th at p. 268.)

immutable fact of nature " 'but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " [Citation.]' [Citation.]" (*Id.* at p. 472, italics omitted; see also *Bryant v. Glastetter* (1995) 32 Cal.App.4th 770, 778 [38 Cal.Rptr.2d 291]; *McCollum v. Friendly Hills Travel Center* (1985) 172 Cal.App.3d 83, 90 [217 Cal.Rptr. 919].) "While it is the province of the jury, as trier of fact, to determine whether an unreasonable risk of harm was foreseeable under the particular facts of a given case, the trial court must still decide as a matter of law whether there was a duty in the first place, even if that determination includes a consideration of foreseeability. [Citations.]" (*Clarke v. Hoek* (1985) 174 Cal.App.3d 208, 214 [219 Cal.Rptr. 845]; *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 819 [59 Cal.Rptr.2d 756, 927 P.2d 1260].)

Therefore, we turn to the task of applying the *Rowland* factors to the record below in assessing the question of whether, and to what extent, the Scouts owed a duty of care to Juarez.[9]

### i. *Foreseeability of Harm*

■■■ In examining the critical element of foreseeability of harm, we must adhere to the rule that "[f]oreseeability supports a duty only to the extent the foreseeability is reasonable." (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 306 [34 Cal.Rptr.2d 498] (*Sturgeon*); *Rowland, supra,* 69 Cal.2d at p. 113.) In other words, "a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated. [Citations.]" (*Ann M., supra,* 6 Cal.4th at p. 676.) Basically, "[t]he reasonableness standard is a test which determines if, in the opinion of a court, the degree of foreseeability is high enough to charge the defendant with the duty to act on it." (*Sturgeon, supra,* 29 Cal.App.4th at p. 307.)

" '[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required.' [Citation.] Thus, foreseeability is a somewhat flexible concept." (*Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 125 [211 Cal.Rptr. 356, 695 P.2d 653]; see also *Kentucky Fried Chicken of Cal., Inc. v. Superior Court, supra,* 14 Cal.4th at p. 819.) If injury to another " ' "is likely enough in the setting of modern life that a reasonably thoughtful

---

[9]As we explained in footnote 4, *ante,* the Church's liability will be discussed separately in a later section of this opinion.

[person] would take account of it in guiding practical conduct" ' [citations], we must label the injury 'reasonably foreseeable' and go on to balance the other *Rowland* considerations." (*Sturgeon, supra,* 29 Cal.App.4th at p. 307.)

 The Scouts acknowledge, as they must, the possibility exists that pedophiles will be attracted to scouting to gain legitimate access to young boys in order to seduce the more susceptible ones into sexual activity. The Scouts can hardly claim otherwise. Legal commentary notes that sex abuse in scouting "is more common than accidental deaths and serious injuries combined," with the Scouts reporting, on average, more than one incident of sexual abuse per week for the past two decades, and with many more cases going unreported. (*Perfect for Pedophiles?, supra,* 76 Tex. L.Rev. at p. 144 and fn. 8.) Sex abuse by volunteers in scouting has been the subject of a book, Scout's Honor, *supra,* which exhaustively examines the problem of "Sexual Abuse in America's Most Trusted Institution." The Scouts's liability for molestation by its volunteers is the focal point of a number of reported cases. (See, e.g., *L.P. v. Oubre* (La. Ct. App. 1989) 547 So.2d 1320, 1324 [finding existence of special relationship giving rise to a duty to warn of risks that were known or should have been known]; *Golden Spread Council, Inc. v. Akins* (Tex. 1996) 926 S.W.2d 287, 290 [Boy Scout council owed no duty based on principle of negligent hiring in connection with scoutmaster's alleged molestation of scout]; *Doe v. Goff* (1999) 306 Ill.App.3d 1131 [240 Ill.Dec. 190, 716 N.E.2d 323, 326-327] [sexual assault of scout not foreseeable, so that Scouts owed no duty to prevent molestation].)

Nevertheless, in supplemental briefing, the Scouts urge us to find that Paz's molestation of Juarez was a third party criminal act, which was not reasonably foreseeable as a matter of law. In so arguing, the Scouts present their own statistics reflecting that a child is at greater risk for sexual molestation in a child care center or family setting than in a scouting unit. In a complex statistical analysis compiled from 1988 data, the Scouts extrapolate that out of 10,000 children participating in scouting, only 1.2 children were possibly exposed to sexual molestation. The Scouts also point out that in the recent case of *Doe v. Goff, supra,* 716 N.E.2d 323, a divided intermediate appellate court in Illinois rejected imposing a duty on the Scouts to implement adequate child protection programs because the statistical incidence of molestation by scoutmasters was so small. (*Id.* at pp. 326-327; but see *id.* at pp. 328-329 (dis. opn. of Breslin, J.).) But the persuasive force of any statistical analysis is severely undercut by a factor recognized in the Boy Scout Handbook: "Studies have demonstrated that more than half of all incidents of child abuse are never reported because the victims are too afraid or too confused to report their experiences."

More importantly, we recognize our analysis must focus on the *foreseeability* of harm occurring, not its probability, a more stringent standard.

Simply citing the statistical improbability of encountering a sexual molester in the course of scouting activities does not establish, as a matter of law, that the risk of sexual molestation is so unforeseeable that a child need not be protected from this harm. Based on this record, we conclude that it should be reasonably foreseeable to the Scouts that a child participating in scouting might fall prey to a sexual predator, with no documented history of such proclivities, who is serving as an adult volunteer in the child's scouting troop.

We are not the first to conclude that children engaged in organized group overnight activities are at risk of foreseeable sexual abuse. We note that almost 40 years ago in *Wallace v. Der-Ohanian* (1962) 199 Cal.App.2d 141 [18 Cal.Rptr. 892], the court found sexual molestation and assault by unknown third parties to be foreseeable crimes from which children who are engaged in organized youth activities should be protected. The case involved an 11-year-old girl who was raped by an unknown assailant while she was attending an overnight summer camp. The court ruled that "the risk of sexual molestation . . . was one which the defendant should have foreseen and better guarded against." (*Id.* at p. 146.) In so holding the court noted, "It is certain that there exists in our civilization the constant possibility that persons suffering from a lack of proper mental balance or normal decency might subject young people to sexual molestation. This fact is illustrated by frequent newspaper accounts of crimes against children, the many litigated criminal cases, accounts of which find their way into the reports, and the concerns of the Legislature evidenced by the enactment of many laws for the protection of children. . . . The general feeling of the public that this problem does exist in a threatening way lead[s] to the conclusion that people charged with the care of children should guard against it . . . ." (*Ibid.*)

While we do not endorse the factors identified in *Wallace* as indicative of the foreseeability that a child at the camp could be sexually assaulted (such as the presence of migrant laborers in the vicinity of the summer camp), we nevertheless accept the court's basic reasoning. Unfortunately, in the almost 40 years since these words were written, the scourge of sexual molestation of children has not abated; and the danger that a child who participates in organized youth activities will encounter a sexual predator certainly is at least as foreseeable now as it was then. These considerations prompt us to reject the Scouts's argument that the harm that befell Juarez while he was participating in Troop 255 activities was unforeseeable as a matter of law.

Nevertheless, foreseeability is not coterminous with duty. (See *Sharon P. v. Arman Ltd.* (1999) 21 Cal.4th 1181, 1189-1190, fn. 2 [91 Cal.Rptr.2d 35, 989 P.2d 121]; *Parsons, supra,* 15 Cal.4th at p. 476;

*Meighan v. Shore* (1995) 34 Cal.App.4th 1025, 1033 [40 Cal.Rptr.2d 744]; *Cohen v. Southland Corp.* (1984) 157 Cal.App.3d 130, 138 [203 Cal.Rptr. 572].) "A court may find that no duty exists, despite foreseeability of harm, because of other factors and considerations of public policy" (*Clarke v. Hoek, supra*, 174 Cal.App.3d at pp. 214-215), including "the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, . . ." (*Rowland, supra*, 69 Cal.2d at pp. 112-113; see also *Scott v. Chevron U.S.A.* (1992) 5 Cal.App.4th 510, 515 [6 Cal.Rptr.2d 810]; *De Vera v. Long Beach Pub. Transportation Co.* (1986) 180 Cal.App.3d 782, 794 [225 Cal.Rptr. 789].) We turn to these additional factors now.

 ii. *Degree of Certainty That Juarez Suffered Harm, and the Closeness Between the Harm and the Scouts's Conduct*

 No one disputes Juarez suffered injury. The significant emotional trauma caused by childhood sexual abuse, with its related societal costs, is well documented and was not rebutted below by the Scouts. However, the Scouts seriously question "the closeness of the connection between the defendant's conduct and the injury suffered." (*Rowland, supra*, 69 Cal.2d at pp. 112-113.) In supplemental briefing, the Scouts seek to sever any link between the alleged failure on its part to implement its Youth Protection Program in Troop 255 from the harm ultimately suffered by Juarez. The Scouts claim "[t]here is no scientific data demonstrating that child abuse prevention education of children has actually prevented any sexual molestation of children."

Despite the Scouts's current litigation posture of disavowing the existence of such a causal link, their own publications tout the effectiveness of their Youth Protection Program in preventing sexual assault. In a staff orientation booklet produced by the Scouts in 1987 entitled "Child Sexual Abuse, How to Deal With It," it is written: "*Perhaps the best way to prevent sexual child abuse is to educate children as to the existence and dangers of child abusers and to encourage them to 'yell and tell.'* . . . Councils should use our available child abuse materials to train youth members how to respond to this threat." (Italics added.) In the Scouts's Youth Protection Guidelines, readers are told: "Another way to protect our youth from the potential abuser is to educate them. Interviews with molesters indicate that any show of resistance by a child is generally enough to discourage any further attempts with that child. For this reason, children need to be told that if anyone asks

them to keep a secret or touches them in private areas of their bodies they should yell and tell. The [Scouts] makes youth protection materials available to members and their parents on a continuing basis." In another scouting publication, it is reported that "[i]n one Midwest city . . . several youths turned in a molester after they watched the video, *A time to tell.* As a result, the local district attorney is now using the video with all victims of child sexual abuse seen there."

Moreover, there is empirical support for the proposition that sexual abuse of children can be mitigated through implementation of programs designed to educate young people and their adult caretakers about sexual abuse. Reportedly, in only the first two years after the Scouts developed and implemented their Youth Protection Program, the number of male scout leaders banned from scouting for sex abuse skyrocketed, from 169 people in 1987 to 302 people in 1989. (Scout's Honor, *supra*, at p. 315.) In attempting to put these statistics in context, the author of Scout's Honor indicates: "The increase shows that the [Scouts's] abuse education program is alarmingly effective. . . . The program exposed molesters who'd gone undetected in Scouting for years, sometimes decades." (*Id.* at p. 316.)

While the Scouts are justified in believing that reasonable prevention methods will not prove sufficient to halt sexual abuse in each and every case, the record nevertheless reflects a recognition in scouting literature that the best line of defense to protect children from sexual exploitation is educating them, their parents, and the adult volunteers on how to avoid such harm. We agree with Juarez that the absence of information about the warning indicators of impending molestation along with the absence of critical advice as to how to rebuff a sexual advance, creates a sufficient causal link between the acts or omissions of the Scouts and the harm he suffered. This link is neither weak nor remote. (*Adams, supra,* 68 Cal.App.4th at p. 270.)

### iii. *Moral Blame*

There is no evidence on summary judgment showing morally blameworthy conduct by the Scouts, as this term is understood in its legal context. (See *Adams, supra,* 68 Cal.App.4th at p. 270.) To the contrary, the Scouts are to be commended for being in the vanguard in fighting child sexual abuse with their educational program which, if communicated, is geared toward teaching volunteer leaders, parents and scouts how to be aware of and avoid child sexual abuse. The record includes expert testimony that is highly laudatory of the quality of the films and programmatic materials produced by the Scouts.

Juarez does not question the quality of the Scouts's Youth Protection Program. Instead, Juarez ascribes fault in the failure by the Scouts to take

reasonable steps to ensure that their knowledge concerning the potential for sex abuse within the scouting environment, and how to avoid it, was imparted to the scouts, adult volunteers, and parents of Troop 255. This omission, if proven, carries with it no particular moral blame. For this reason, this factor is in favor of the Scouts.

### iv. *Policy of Preventing Future Harm, the Consequences to the Community, and the Burden of Duty on Scouts*

Our greatest responsibility as members of a civilized society is our common goal of safeguarding our children, our chief legacy, so they may grow to their full potential and can, in time, take our places in the community at large. The achievement of this objective is gravely threatened by sexual predators who prey on young children. The legislative judgment, which reflects a widely shared value of our society, is that the use of children as sexual objects is extremely harmful to their well-being. Its long-lasting injury often lies hidden in a victim's psyche until it works its insidious harm by impairing subsequent emotional development, if not by also crushing the victim's spirit.

Public policy against the victimization of children is most evident in our criminal laws, which exact a heavy toll from those who endanger our most precious asset. (See, e.g., Pen. Code, §§ 288, subd. (a), 288.5, subd. (a).) So, too, it must be in our civil law. The interests of the state in protecting the health, emotional welfare and well-rounded growth of its young citizens, together with its undeniable interest in safeguarding the future of society as a whole, weigh strongly in favor of imposing a duty in this case. Such a duty will motivate the Scouts to take reasonable steps to see that the vital information imparted in its child abuse prevention program is provided to those who can most benefit from it—scouts, their parents, and adult volunteers—and this heightened awareness can prevent future occurrences of sexual molestation. Therefore, the policy of preventing future harm and the consequences to the community of that harm are factors squarely in Juarez's favor.

We finally consider the extent of the burden to the Scouts in imposing a duty. Juarez points out that the Scouts have a highly developed and effective delivery system in place to ensure that its program, uniforms, equipment, and handbooks get into the hands of individual scouts. Juarez claims that in light of this delivery system, it would not have taken heroic measures for the Scouts to see that the critical component of its Youth Protection Program reached the members of Troop 255. In supplemental briefing, Juarez argues "the record shows that whatever materials [the Scouts] may have had in its

arsenal of abuse prevention programming—including Spanish-language print materials—it failed to deploy them in Troop 255," and in this case, such "a haphazard delivery system simply was not good enough."

The Scouts hold a significant position in American society. The Scouts extoll the fact that their organization was chartered by an act of Congress in 1915. (36 U.S.C. § 23.) That charter empowers the Scouts "to promote . . . the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues . . . ." As our Supreme Court has noted: "[T]he Boy Scouts is an organization whose primary function is the inculcation of a specific set of values in its youth members, and whose recreational facilities and activities are complementary to the organization's primary purpose. . . . Scouts meet regularly in small groups (often in private homes) that are intended to foster close friendship, trust and loyalty, and scouts are required to participate in a variety of activities, ceremonies, and rituals that are designed to teach the moral principles to which the organization subscribes." (*Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670, 697-698 [72 Cal.Rptr.2d 410, 952 P.2d 218].)

Thus, millions of American parents partner with the Scouts collectively for the development of their children's core values. Scouting programs extend into almost every city and town in the nation. In fact, it has been reported that nearly 20 percent of the American youth population comes into contact with scouting every year. A 1991 publication by the Scouts acknowledges that, "[b]ecause of the unique role of the Boy Scouts of America in the development of millions of young boys each year, it is important for the BSA to understand this societal problem [of child sexual abuse] and know the steps to combat it."

The record before us reveals that people and systems are already in place to see that vital information needed to combat child sexual abuse is communicated at every level of scouting. The Scouts have a national headquarters in Irving, Texas, which develops their programs, establishes policies and procedures, and designs leadership training for scouting professionals and volunteer leaders. In 1992, shortly after Juarez was molested, there were 7,500 people employed full-time in scouting across the country. Consequently, the organization has a highly developed and effective delivery system, enabling the Scouts to impart its program and philosophy to 4,200,000 youths and 1,300,000 adult volunteers in more than 130,000 scouting units across the county.

With the privilege of being able to contribute directly to the moral and spiritual development of millions of American youths comes some legal

responsibility. In light of the record in this case, we soundly reject any contention that the Scouts could avoid all legal responsibility to incorporate into their program information designed to prevent a significant risk of harm to the youths it serves on the ground that any burden imposed would be too onerous. We are persuaded that recognizing a legal duty of care will have beneficial consequences for the community as a whole, which vastly outweighs the slight burden imposed on the Scouts. (*Parsons*, *supra*, 15 Cal.4th at pp. 473-477.)

Deflecting the conclusion commanded by this analysis, the Scouts warn that any duty would apply not only to their organization but also to all defendant organizations in future cases that confront the same risk of harm to children, regardless of the differences in the surrounding circumstances. The Scouts present impassioned arguments about the inherent difficulty in defining a workable duty of care, warning that fulfilling such a duty would impose substantial costs and undue administrative burdens on charitable organizations that work with children, which would inevitably decrease the level or quality of the important services they provide.

In response, we wish to make special note that the reach of this opinion is only intended to extend as far as the record before us today. If we have not yet made it abundantly clear, deciding the question of duty mandates a case-by-case fact and policy analysis. (*Parsons*, *supra*, 15 Cal.4th at p. 472; *Isaacs v. Huntington Memorial Hospital*, *supra*, 38 Cal.3d 112, 124; *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) We do not intend our decision to serve as a manifesto by which lower courts are to impose duties of care upon all forms of charitable organizations engaged in volunteer youth programs, requiring them to take steps to prevent or minimize the chance that group leaders will engage in intentional misconduct against the youths participating in their programs. Because we expect our analysis to carry this caveat implicitly, and now explicitly, we do not share the Scouts's concern that imposition of a duty will work a grave hardship on others whose programs, experience with abuse of minors, and other factors we identify as important to the issue of duty are not examined by us today.

### v. *Balancing*

In conclusion, consideration of the *Rowland* factors supports the imposition of a duty of care on the Scouts to have taken reasonable protective measures to protect Juarez from the risk of sexual abuse by adult volunteers involved in scouting programs, such as warning, training or educating him (either directly or through his parent or adult volunteers) about how to avoid

such a risk. Of these factors, only the lack of moral blame is determined in favor of the Scouts. The rest are unequivocally in favor of Juarez and the existence of a duty.

 d. *Special Relationship Creating Responsibility for Third Party Criminal Acts*

 Alternatively, we note that liability for negligence "is not imposed for the failure to assist or protect another, absent some legal or special relationship between the parties giving rise to a duty to act. [Citations.]" (*People v. Heitzman* (1994) 9 Cal.4th 189, 200 [37 Cal.Rptr.2d 236, 886 P.2d 1229]; *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894]; see also *Eric J. v. Betty M.* (1999) 76 Cal.App.4th 715, 727 [90 Cal.Rptr.2d 549]; *Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1499 [57 Cal.Rptr.2d 406].) The special relationship doctrine has developed as a means of avoiding imposing a duty to take protective action for the benefit of a potential victim when there is no relationship to the person needing protection. (See generally *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].)

Generally, a greater degree of care is owed to children because of their lack of capacity to appreciate risks and avoid danger. (*Casas v. Maulhardt Buick, Inc.* (1968) 258 Cal.App.2d 692, 697, 700 [66 Cal.Rptr. 44].) Consequently, California courts have frequently recognized special relationships between children and their adult caregivers that give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties. Recognized special relationships include an operator of a preschool or daycare center to the children in attendance (*Fowler v. Seaton* (1964) 61 Cal.2d 681, 688 [39 Cal.Rptr. 881, 394 P.2d 697]); a school district to a mother whose child was sexually molested by another student because the school stood in loco parentis while the child was in attendance (*Phyllis P. v. Superior Court* (1986) 183 Cal.App.3d 1193, 1196 [228 Cal.Rptr. 776]); and the wife of a sexual offender to children she invited to play in her home because "[b]eing of tender years they were particularly vulnerable to this sort of misconduct and not fully able to protect themselves against it. [Citation.]" (*Pamela L. v. Farmer* (1980) 112 Cal.App.3d 206, 211 [169 Cal.Rptr. 282].)

In *Adams*, the majority noted at length the expanding view in tort jurisprudence that the use of special relationships to create duties has been

largely eclipsed by the more modern use of balancing policy factors enumerated in *Rowland*. (*Adams*, *supra*, 68 Cal.App.4th at pp. 285-287.)[10] We observed that the "pedantic use of the Restatement (Second) of Torts [defining principles supporting 'special relationship' doctrine] to establish the parameters of tort duty, while eschewing public policy concerns, is contrary to modern jurisprudential duty analysis." (*Id.* at p. 286.)

▇▇▇ For the reasons set out in *Adams*, we are reluctant to rely on the special relationship doctrine per se as the analytical underpinning for our conclusion that a duty of care was owed by the Scouts to Juarez. However, we note that cases exploring this alternative theory of tort duty have found a special relationship, giving rise to a duty to protect children against a known risk that they might be sexually molested. One jurist has described the special relationship between the child participant and youth organization in terms particularly pertinent to this case: "The mission of youth organizations to educate children, the naiveté of children, and the insidious tactics employed by child molesters dictate that the law recognize a special relationship between youth organizations and the members such that the youth organizations are required to exercise reasonable care to protect their members from the foreseeable conduct of third persons." (*Evans v. Ohio State Univ.* (1996) 112 Ohio. App.3d 724 [680 N.E.2d 161, 181] (conc. & dis. opn. of Lazarus, J.).)

While the multifactored, policy-driven *Rowland* analysis provides a sufficiently robust doctrinal basis to support imposition of a duty, were we to rely on this alternative analysis, we, too, would conclude that a special relationship existed between the Scouts and Juarez giving rise to a duty to protect him from harm caused by the criminal conduct of third parties.

 e. *Triable Issue of Fact as to Negligence, Breach of Duty and Causation*

An action for negligence additionally requires a showing that the defendant breached a legal duty owed to the plaintiff, and that the breach was a proximate or legal cause of the plaintiff's injuries. (*Sharon P. v. Arman, Ltd.*, *supra*, 21 Cal.4th at p. 1188; *Ann M.*, *supra*, 6 Cal.4th at p. 673.) We conclude Juarez has presented sufficient evidence to raise triable issues of fact that the Scouts failed to take reasonable protective measures to protect

---

[10]Presiding Justice Kline disassociates himself from this statement, as he adheres to the view that the California Supreme Court, the Restatement, and most other authorities " 'all recognize that "special relationship" is an expanding concept in tort law. [Citations.]' " (*Adams*, *supra*, 68 Cal.App.4th at pp. 307-308 (dis. opn. of Kline, P. J.), quoting *Mann v. State of California* (1977) 70 Cal.App.3d 773, 779 [139 Cal.Rptr. 82].) For the reasons set forth in his dissent in *Adams*, Presiding Justice Kline believes this has been a salutary development.

him from the risk of sexual abuse by adult volunteers involved in scouting programs, and that the failure to take such steps exposed him to an increased danger of sexual molestation.

Juarez presented evidence opposing the summary judgment motion indicating that while a praiseworthy Youth Protection Program was created by the Scouts, they failed to take reasonable steps to see that the information in the program was likely to be communicated to the scouts, parents, or adult leaders of Troop 255. For example, Aguilar received only limited information of the type contained in the Youth Protection Program, and he was not active in the troop during the time Juarez was a member. Aguilar's replacement as scoutmaster, Robles, received no training and was completely unaware of the availability of the Youth Protection Program materials. Apparently, no one at the local council, a constituent body of the Scouts established to provide training and guidance to the troops within its jurisdiction, ever spoke to Robles. Although Robles was aware that Paz sometimes took the troop on overnight camping excursions by himself, and sometimes slept in the same tents as the boys, Robles received no information that such activities were prohibited in the scouting program.

The troop was comprised of Spanish-speaking boys, most of whom were recent immigrants to this country. The troop meetings were conducted in Spanish. Yet the members of this troop were provided with English-language copies of the Boy Scout Handbook. Although the handbook was available in Spanish, neither the boys nor their parents were even advised of such. No one showed them the film A Time to Tell or provided the other materials comprising the Scouts's Youth Protection Program. They were not told of the availability of these program materials.

The Scouts steadfastly maintain there is no evidence "that educational programs intended to teach children how to avoid child sexual abuse do more good than harm, or that they have actually prevented any molestation in the first place." But, the Scouts's own materials vaunted the Youth Protection Program as imparting critical information to successfully repel a sexual overture. Certainly, this evidence, if credited by the fact finder at trial, supports Juarez's position that the molestations would not have occurred if he and his mother been advised of the materials in the Scouts's Youth Protection Program, and if the adult leaders of Troop 255 had received appropriate training.

Our opinion that questions of fact exist should not be construed as resolving the negligence issue in favor of Juarez. Rather, on the basis of the evidence, Juarez is entitled to an opportunity to prove the merits of his case

at a trial. While the evidence may ultimately establish there was no breach of the Scouts's duty or that any breach was neither a cause in fact nor legal cause of any damages, we conclude that the record, at this point, does not conclusively eliminate the possibility of the Scouts's liability. (See generally *Adams, supra,* 68 Cal.App.4th at p. 265; *Nola M. v. University of Southern California, supra,* 16 Cal.App.4th at pp. 427-428; see also *Brummett v. County of Sacramento* (1978) 21 Cal.3d 880, 887 [148 Cal.Rptr. 361, 582 P.2d 952, 4 A.L.R.4th 858].) Accordingly, summary judgment was improperly granted with respect to this cause of action.

## C. *Summary Judgment as to the Church*

It is apparent from this record that there are no triable issues of fact with respect to the Church's liability stemming from the Scouts's use of Church property to hold Troop 255's meetings. There are no allegations or evidence to support the conclusion that the Church had any duty or ability to screen, train, or supervise the adult volunteers working with Troop 255, including Paz.

Nor have material facts been proffered by Juarez to support his cause of action against the Church alleging premises liability. Juarez has stated in his declaration that some of the acts of sexual molestation, specifically inappropriate touching, occurred on property owned by the Church. However, Juarez does not claim there were facts that put or should have put the Church on notice of the molestation, nor does he claim the Church could have taken effective steps to prevent the sexual molestation. Juarez implies that the Church was strictly liable for anything occurring on its premises.

This is not the law in California. The recent case of *Eric J. v. Betty M., supra,* 76 Cal.App.4th 715, provided a thorough overview of the law of premises liability in the context of a convicted child molester allegedly molesting a child on property owned by the defendants. The court affirmed a grant of nonsuit for the defendants because "there was no relationship between the harm and any premises owned by family members on which the harm occurred." (*Id.* at p. 717.) By way of explanation, the court noted that in the context of business or public property, "liability has been allowed when there is something foreseeably dangerous about the nature of the activity conducted on the property or the property itself which fixes on the landowner the duty to take some sort of precaution [citation] . . . or the owner has in some way undertaken, as part of the organized activity on the land, care for the safety of the plaintiff as against criminal acts of third parties [citations]." (*Id.* at p. 721.)

None of these bases for premises liability described by *Eric J.* are shown by the facts of this case. There was nothing about the nature of the activity

conducted on the property—holding scout meetings—to characterize the activity as foreseeably dangerous. Nor was there anything about the nature of the property owned by the Church to implicate liability—it was just a room in the Church. Nor was there any evidence the Church had any duty or ability to oversee the activities conducted by Troop 255. A consideration when imposing liability over a landlord is whether the landlord could have done anything to prevent the harm. (See, e.g., *Davis v. Gomez* (1989) 207 Cal.App.3d 1401, 1406 [255 Cal.Rptr. 743]; *Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 512 [118 Cal.Rptr. 741, 81 A.L.R.3d 628].) "[A] landlord should not be held liable for injuries from conditions over which he has no control." (*Uccello, supra,* at p. 512.)

For these reasons, we conclude that summary judgment was properly granted as to the Church.

## IV.

### DISPOSITION

The judgment is reversed. The case is remanded for further proceedings in accordance with this opinion. Costs on appeal are awarded to Juarez as against the Scouts. Costs on appeal are also awarded the Church as against Juarez.

Kline, P. J., and Haerle, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 9, 2000.