5 Cal.Rptr.3d 394 (2003)
112 Cal.App.4th 711
Benjamin KADISH, a Minor, etc., et al., Plaintiffs and Appellants,
v.
JEWISH COMMUNITY CENTERS OF GREATER LOS ANGELES et al., Defendants and Respondents.
No. B159740.
Court of Appeal, Second District, Division One.
October 10, 2003.
As Modified October 28, 2003.
Review Granted December 23, 2003.
*395 Law Offices of Joseph M. Lovretovich, Woodland Hills, Joseph M. Lovretovich and Sara J. Venteicher for Plaintiffs and Appellants.
Gibson, Dunn & Crutcher, Scott A. Edelman and Michael S. Brophy, Los Angeles, for Defendants and Respondents.
MALLANO, J.
In the summer of 1999, a Jewish organization received vague threats of violence against its members. On August 10, 1999, a self-proclaimed anti-Semite appeared at the organization's summer camp and, armed with a gun, opened fire, wounding at least one child. In this action, the child and his family seek to hold the organization liable for allegedly failing to provide adequate security measures.
The trial court dismissed the action on demurrer, concluding that the organization did not have a duty to prevent such a crime. We affirm because the violent criminal assault was not reasonably foreseeable, and imposing liability based on vague threats of violence, absent prior armed assaults or other incidents of a similar nature, would impose an unfair burden on the organization.

I

BACKGROUND
After two successful demurrers, plaintiffs filed a second amended complaint. For purposes of our review, we must accept as true the following allegations. (See Blank v. Kirwan (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.)
In June 1999, Eleanor and Charles Kadish (the Kadishes) enrolled their sons, Benjamin (age 5) and Joshua (age 9), in a summer camp, Camp Valley Chai, run by the Jewish Community Centers of Greater Los Angeles (JCC). The JCC operated several centers in the Los Angeles area. The Kadishes' children were to be dropped off at the West Valley Center and bused to the North Valley Center in Granada Hills, where the camp is located. The Kadishes entrusted the JCC with the custody and safekeeping of their children.
Camp Valley Chai, as described in the camp brochure, is "Where the Children Play." The camp offered three programs, each for a different age group. The brochure *396 described the "Aleph" program, for children entering kindergarten and the first grade, as follows: "Activities are evenly paced to provide an all-day program that is exciting but not over-stimulating. With a ratio of one staff to six campers, children will receive close attention and direction. Campers will also participate in camp-wide events. Activities are specifically geared to the interests and abilities of this age group, which include: singing, arts & crafts, Judaica, games, drama, swimming, and more. Campers also participate in specialty days that combine fun and imagination with learning about American and Jewish life."
According to the brochure, the "Bet" program, for children entering the second through the fifth grades, included "sports, dancing, arts & crafts, swimming, singing, cooking, field trips, and Judaic programming. With a ratio of one staff to six campers, children engage in program-wide events, as well as camp-wide events. Bet campers have the opportunity to attend a one-night overnight."
The "Gimmel" program, for children entering the sixth through the eighth grades, provided "an action-packed summer filled with new experiences, field trips, and more! Each session will include a two-night overnight, swimming, trips to the beach, amusement parks, and other cool places. Special camp events and projects encourage a connection to Jewish culture, themes, and values."
The brochure stated that "[a]t Camp Valley Chai, our goal is to find and expose the personal talents within each and every camper. Our staff strives to create an atmosphere of fun, friendship, sharing, group and individual achievement." According to the brochure, campers would enjoy a "safe camping experience" set in a "secure environment" at the camp's "expansive camp site."
But, during the summer of 1999, all was not safe and secure for Jewish organizations. Attacks at synagogues and Jewish community centers in the United States were planned and carried out. Jewish organizations across the country referred to the summer of 1999 as the "summer of hate." The Anti-Defamation League sent notices to Jewish groups throughout the nation advising them to increase security. The West Coast office of the Anti-Defamation League notified Jewish organizations that there was a "strong potential" of violence against their members.
From June to August 1999, the West Valley Center and the North Valley Center received anonymous telephone calls threatening their members with physical violence. The North Valley Center, located one block from an exit off the 118 Freeway, had a large sign identifying it as a Jewish facility. The center had no locks on the entry door, no security guards, and no emergency evacuation plan, notwithstanding that the JCC had implemented those precautions at other locations. Dating back to at least 1989, the Anti-Defamation League and groups within the JCC had recommended that the North Valley Center adopt security measures.
Beginning in early 1999, Buford Furrow, an individual with publicly avowed anti-Semitic views, began traveling and observing Jewish facilities in Southern California with the purpose of shooting and killing Jews. On the evening of August 9, 1999, Furrow sat outside the North Valley Center watching people come and go. No one asked him why he was there. He chose the North Valley Center as the site for his "war on Jews" because it, unlike other JCC facilities, had no security precautions. On August 10, 1999, Furrow entered the North Valley Center and shot Benjamin. His brother, Joshua, was not shot but "perceived" Benjamin's shooting.
*397 On April 20, 2001, the Radishes filed this action on behalf of themselves and their children, naming as defendants the JCC, the North Valley Center, and the West Valley Center (collectively JCC). Benjamin asserted a cause of action for negligence, alleging that a lack of security measures allowed Furrow to shoot him. Joshua brought a cause of action for negligence, alleging that he had been in the line of fire and had perceived the assault on his brother. The Kadishes alleged a cause of action for negligence based on the emotional distress they suffered as a result of the injury to their children. They also alleged a cause of action for breach of contract, claiming that the JCC failed to provide a safe and secure camping environment.
The JCC demurred to the complaint, contending that it did not have a duty to protect campers from violent criminal assaults. Plaintiffs filed opposition. The trial court sustained the demurrer with leave to amend. A first amended complaint was filed, much like the original. Another demurrer was filed, opposed, and sustained with leave to amend. Plaintiffs filed a second amended complaint, which was also challenged by demurrer. The trial court sustained the demurrer without leave to amend. On May 6, 2002, the trial court entered an order dismissing the case. Plaintiffs filed a timely appeal.

II

DISCUSSION
In reviewing the sufficiency of a complaint against a general demurrer that was sustained, we treat the demurrer as admitting all material facts that are properly pleaded and determine whether the complaint states facts sufficient to constitute a cause of action. (Blank v. Kirwan, supra, 39 Cal.3d at p. 318, 216 Cal.Rptr. 718, 703 P.2d 58; accord, Zelig v. County of Los Angeles (2002) 27 Cal.4th 1112, 1126, 119 Cal.Rptr.2d 709, 45 P.3d 1171.) "In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc, § 452.)
"In order to establish liability on a negligence theory, a plaintiff must prove duty, breach, causation and damages." (Ortega v. Kmart Corp. (2001) 26 Cal.4th 1200, 1205, 114 Cal.Rptr.2d 470, 36 P.3d 11.) "`To say that someone owes another a duty of care "`is a shorthand statement of a conclusion, rather than an aid to analysis in itself.... "[D]uty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection...'" ...."' (Merrill v. Navegar, Inc. (2001) 26 Cal.4th 465, 477, 110 Cal.Rptr.2d 370, 28 P.3d 116.) The trial courts determination [as to whether] a duty exists is reviewed de novo by the appellate court as a question of law." (Mendoza v. City of Los Angeles (1998) 66 Cal.App.4th 1333, 1339, 78 Cal.Rptr.2d 525.)
We begin with the fundamental principle, codified in section 1714 of the Civil Code, that "[e]very one is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property...." (Civ.Code, 1714, subd. (a).)
More than three decades ago, in Rowland v. Christian (1968) 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (Rowland), our Supreme Court stated that the determination of whether a property owner is liable for injuries to persons on the property "involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the *398 degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendants conduct and the injury suffered, the moral blame attached to the defendants conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.... [¶] ...
"The proper test to be applied to the liability of the possessor of land in accordance with section 1714 of the Civil Code is whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others ...." (Rowland, supra, 69 Cal.2d at pp. 112-119, citations omitted; accord, Merrill v. Navegar, Inc., supra, 26 Cal.4th at p. 477.)
In Mark v. Pacific Gas Electric Co. (1972) 7 Cal.3d 170, 101 Cal.Rptr. 908, 496 P.2d 1276, the light from a street lamp post was so bright it disturbed the sleep of nearby residents, and they complained to the utility company, PGE. Notwithstanding efforts by PGE to reduce the glare, the light continued to cause problems. Eventually, the residents resorted to self-help and unscrewed the light bulb. PGE sent an employee who screwed the bulb back in place. Each time this was done, the residents unscrewed the bulb. Thus, PGE knew that someone was tampering with the light. On one occasion, a resident attempted to remove the bulb, touched an uninsulated wire, and was electrocuted. In a suit for wrongful death, the trial court granted a nonsuit for PGE.
The Supreme Court reversed, applying the Rowland factors. (See Mark v. Pacific Gas Electric Co., supra, 7 Cal.3d at pp. 177-178 fns. 1, 2-5.) The court stated that "harm to decedent was certainly foreseeable, given PG & E's knowledge of tampering with high voltage wiring, and a clear causal relationship existed between the accident and PG & E's asserted negligence in failing to warn of or repair the hazard. Although PG & E may have been `morally' without blame, imposition of liability would enhance the policy of preventing future accidents. Finally, imposition of liability does not seem unduly burdensome to PG & E considering the probable availability of insurance covering accidents of this nature which are not likely to recur with great frequency." (Id. at p. 178, fn. 5, 101 Cal.Rptr. 908, 496 P.2d 1276.)
The Rowland factors were later applied in Peterson v. San Francisco Community College Dist. (1984) 36 Cal.3d 799, 205 Cal.Rptr. 842, 685 P.2d 1193. There, a student was assaulted as she went up a stairway in the school's parking lot. An unidentified man jumped from behind thick and untrimmed foliage and trees and attempted to rape her. She escaped but sustained physical and emotional injuries. The school district knew that other assaults of a similar nature had occurred in the area but did not publicize the prior incidents or warn the student that she was in danger of being attacked. The student sued the school district and its agents. The trial court dismissed the action on demurrer.
The Supreme Court reversed, stating: "An examination of the policies discussed in Rowland, supra, 69 Cal.2d 108 [70 Cal. Rptr. 97, 443 P.2d 561], and other cases compels the conclusion that the defendants did in fact owe the plaintiff a duty of care. First, the allegations, if proved, suggest that harm to the plaintiff was clearly foreseeable. In light of the alleged prior similar incidents in the same area, the defendants were on notice that any woman who might use the stairs or the parking lot would be a potential target. Secondly, it is *399 undisputed that plaintiff suffered injury. Third, given that the defendants were in control of the premises and that they were aware of the prior assaults, it is clear that failure to apprise students of those incidents, to trim the foliage, or to take other protective measures closely connects the defendants conduct with plaintiffs injury. These factors, if established, also indicate that there is moral blame attached to the defendants failure to take steps to avert the foreseeable harm. Imposing a duty under these circumstances also furthers the policy of preventing future harm. Finally, the duty here does not place an intolerable burden on the defendants." (Peterson v. San Francisco Community College Dist, supra, 36 Cal.3d at p. 814, 205 Cal.Rptr. 842, 685 P.2d 1193.)
In Lopez v. McDonald's Corp. (1987) 193 Cal.App.3d 495, 238 Cal.Rptr. 436 (McDonald's), a restaurant had been the site of several crimes, including robbery, petty theft, vandalism, and grand theft. Crime statistics showed that numerous assaults and batteries had been committed in the surrounding area. The crime problem was so serious that a private security company contacted McDonald's corporate office, recommending that security guards be hired. A McDonald's official declined, saying, "`We don't want to spend any money. There is no problem, we don't need it anyways.'" (Id. at p. 502, 238 Cal.Rptr. 436.) A nearby Jack in the Box employed security guards.
Two months after McDonald's decided not to hire security guards, an individual armed with a semiautomatic rifle, a semiautomatic pistol, and a 12-gauge shotgun entered the restaurant and immediately opened fire, killing 21 people and wounding 11 others. In a suit brought by survivors and surviving family members of the victims, the trial court granted summary judgment in favor of McDonald's.
The Court of Appeal affirmed on the ground that "the Rowland factors and specifically the unforeseeability of the unique, horrific ... event require negligence liability to be restricted here. First, as to the foreseeability of harm to plaintiffs, the theft-related and property crimes of the type shown by the history of its operations, or the general assaultive-type activity which had occurred in the vicinity bear no relationship to purposeful homicide or assassination.... [T]he likelihood of this unprecedented murderous assault was so remote and unexpected that, as a matter of law, the general character of McDonald's nonfeasance did not facilitate its happening....
"Plaintiffs' reliance on the evidence of mostly theft-related crimes on and nearby the ... [restaurant's] premises and the crime rate in the surrounding area, to show the event here was reasonably foreseeable, is misplaced.... [T]he predominantly theft-related character of the crimes is simply probative of the foreseeability of such crimes.... [N]ot only was [the assailant's] crime not theft-related, but the narrow focus on slaughter and [the assailant's] ... motive are unrelated to the areas general crime rate as a matter of law. [¶] ...
"[W]ithin the context of the third-party criminal conduct involved here, no moral blame attaches to [McDonald's] nonfeasance. Further, although the policy of preventing future harm is great, the extent of the burden to [McDonald's] and the consequences to the community of imposing a duty to protect against heavily-armed ... murderers is onerous." (McDonald's, supra, 193 Cal.App.3d at pp. 509-512, fns. omitted; see Thai v. Stang (1989) 214 Cal.App.3d 1264, 1273, 263 Cal.Rptr. 202 ["imposing a duty to protect against driveby shootings would place an onerous burden on business owners"; no duty imposed]; *400 Parsons v. Crown Disposal Co. (1997) 15 Cal.4th 456, 472-478 fn. 20, 63 Cal.Rptr.2d 291, 936 P.2d 70 [no duty of care imposed where duty would place onerous burden on defendant and others].)
In Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 674, 25 Cal. Rptr.2d 137, 863 P.2d 207 (Ann M.), the plaintiff was raped in a shopping center where she worked. She filed suit against the property owners, alleging that security guards should have been hired to patrol the premises. Evidence showed that transients often loitered in the common areas, causing tenants and employees to be concerned about safety. The merchants association had requested that the property owners provide security patrols but none were provided. Bank robberies and purse snatchings had occurred on the premises, but the property owners did not know about them. In the two years before the rape, violent crimes had occurred in the census tract in which the shopping center was located.
The property owners moved for summary judgment, contending they owed no duty to the plaintiff, primarily because the rape was unforeseeable. The trial court granted the motion. The Supreme Court, citing the Rowland factors (see Ann M., supra, 6 Cal.4th at pp. 675-679 fn. 5, 25 Cal.Rptr.2d 137, 863 P.2d 207), agreed, explaining:
"... California law requires landowners to maintain land in their possession and control in a reasonably safe condition.... In the case of a landlord, this general duty of maintenance, which is owed to tenants and patrons, has been held to include the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures.... ¶ ...
"[A]s frequently recognized, a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated.... [¶] In this, as in other areas of tort law, foreseeability is a crucial factor in determining the existence of duty.... [¶] ...
"Turning to the question of the scope of a landlords duty to provide protection from foreseeable third party crime, ... we have recognized that the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed.... "`[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required.... On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." ...' ... Or, as one appellate court has accurately explained, duty in such circumstances is determined by a balancing of `foreseeability' of the criminal acts against the `burdensomeness, vagueness, and efficacy' of the proposed security measures ....
"`... No one really knows why people commit crime, hence no one really knows what is "adequate" deterrence in any given situation....' [A] high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards.... [T]he requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowners premises. To hold otherwise would be to impose an unfair burden upon landlords and, in effect, would force landlords to become the insurers of public safety, contrary to well-established policy in this state." (Ann M., supra, 6 Cal.4th at *401 pp. 674-679, 25 Cal.Rptr.2d 137, 863 P.2d 207 citations and fn. omitted.)
The principles announced in Ann M. were applied in Sharon P. v. Arman, Ltd. (1999) 21 Cal.4th 1181, 91 Cal.Rptr.2d 35, 989 P.2d 121 (Sharon P.), disapproved on another point in Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 853, footnote 19. In Sharon P., the plaintiff was sexually assaulted at gunpoint in a commercial parking garage located under an office building. No physical assaults or gun-related crimes had occurred in the garage during the 10 years preceding the assault, although a bank on the ground floor had been robbed seven times in the two years before the assault. It was not unusual for lights in the garage to be out, causing areas to be dark. A security camera had not been working for several months.
The plaintiff sued the property owner and the company that managed the garage, alleging that the lack of security measures resulted in the assault. The trial court granted summary judgment in favor of the defendants. The Supreme Court concluded that there was no liability, stating:
"[T]he record remains deficient in establishing the foreseeability of violent attacks such as the one against plaintiff. Viewing the record in the light most favorable to plaintiff, it shows that robbers repeatedly targeted a bank on the ground floor of the subject premises in the 27 month period preceding the sexual assault. Apart from those incidents, there is no evidence of other prior crimes against property or persons on the premises, either in the office building or in the underground parking garage. Since sexual assault is not a reasonably foreseeable risk associated with bank robberies ..., the bank robberies did not portend the vicious assault committed upon plaintiff. [¶] ...
"It is difficult to quarrel with the abstract proposition that the provision of improved lighting and maintenance, operational surveillance cameras and periodic walk-throughs of the tenant garage ... might have diminished the risk of criminal attacks occurring in the garage. But absent any prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location, we cannot conclude defendants were required to secure the area against such crime." (Sharon P., supra, 21 Cal.4th at pp. 1197-1199, 91 Cal.Rptr.2d 35, 989 P.2d 121 citation omitted.)
Rowland and its progeny have been cited or applied in several other cases. (See, e.g., Zelig v. County of Los Angeles, supra, 27 Cal.4th 1112, 119 Cal.Rptr.2d 709, 45 P.3d 1171 [county not liable where, in connection with spousal and child support proceedings, father shot mother to death in county courthouse]; Saelzler v. Advanced Group 400 (2001) 25 Cal.4th 763, 107 Cal. Rptr.2d 617, 23 P.3d 1143 [landlord not liable for assault on plaintiff, who was delivering package to tenant, absent proof that lack of security was substantial factor in causing plaintiffs injuries]; Kentucky Fried Chicken of Cal, Inc. v. Superior Court (1997) 14 Cal.4th 814, 59 Cal.Rptr.2d 756, 927 P.2d 1260 [proprietor of business has no duty to comply with armed robbers demand for money even if compliance would avoid increasing risk of harm to customers]; Alcaraz v. Vece (1997) 14 Cal.4th 1149, 60 Cal.Rptr .2d 448, 929 P.2d 1239 [owner of private residential property may be liable to tenant for dangerous condition on adjacent public property controlled by owner]; Claxton v. Atlantic Richfield Co. (2003) 108 Cal.App.4th 327, 339, 133 Cal.Rptr.2d 425 [nonsuit reversed where plaintiff was attacked at gas station by gang members who had previously assaulted other customers and robbed gas *402 station manager; foreseeability turns on prior similar incidents, not identical incidents]; Eric J. v. Betty M. (1999) 76 Cal. App.4th 715, 720-722, 90 Cal.Rptr.2d 549 [citing cases].)
In determining whether the JCC had a duty to protect plaintiffs from harm, we "balance two important and competing policy concerns: society's interest in compensating persons injured by another's [criminal] acts, and its reluctance to impose unrealistic financial burdens on property owners conducting legitimate business enterprises on their premises." (Saelzler v. Advanced Group 400, supra, 25 Cal.4th at p. 766, 107 Cal.Rptr.2d 617, 23 P.3d 1143.)
With the foregoing case law and policy concerns in mind, we now apply the Rowland factors.[1]

A. Foreseeability
"In examining the critical element of foreseeability of harm, we must adhere to the rule that `[f]oreseeability supports a duty only to the extent the foreseeability is reasonable....' In other words, `a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated ...' .... Basically, `[t]he reasonableness standard is a test which determines if, in the opinion of a court, the degree of foreseeability is high enough to charge the defendant with the duty to act on it.'" (Juarez v. Boy Scouts of America, Inc. (2000) 81 Cal.App.4th 377, 402, 97 Cal.Rptr.2d 12 (Juarez), citations omitted.)
"`[A]lmost any result [is] foreseeable with the benefit of hindsight.'... For that reason, foreseeability is not coterminous with duty.... "`A court may find that no duty exists, despite foreseeability of harm, because of other [Rowland] factors ...."'" (Sakiyama v. AMF Bowling Centers, Inc. (2003) 110 Cal.App.4th 398, 407, citations omitted.)
In the present case, there were no prior incidents at the North Valley Center that would make Furrows shooting spree foreseeable. (See Sharon P., supra, 21 Cal.4th at pp. 1191-1199; Ann M., supra, 6 Cal.4th at pp. 674-679, 25 Cal.Rptr.2d 137, 863 P.2d 207; McDonald's, supra, 193 Cal.App.3d at pp. 509-510, 238 Cal.Rptr. 436.) That would end our inquiry, but for the threats of harm to JCC members. Threats of criminal acts may make the acts foreseeable to the property owner, who may be able to take security measures to prevent the threatened harm, depending upon the contents of the threat, including its specificity.
Thus, we must determine whether the shooting at the North Valley Center was foreseeable in light of the threats to JCC members. For that purpose, we examine the pertinent allegations of the complaint. More than 10 years before the incident at the North Valley Center, Jewish organizations, including individuals within the JCC and the Anti Defamation League, were aware of the threat of violence against members of Jewish organizations and had recommended that the North Valley Center adopt security measures. Nationwide, Jewish organizations referred *403 to the summer of 1999 as the "summer of hate." In the two and one-half months before Furrows attack, the North Valley Center received anonymous telephone calls, threatening physical violence against its members.
We conclude that these vague threats were not sufficiently specific so as to require that security measures be adopted to prevent a maniac from shooting children at a summer camp. Plaintiffs did not allege any specifics about the threatswho, what, when, where, or how. Anonymous threats of such a vague nature do not provide an organization with guidance about what, when, and where precautions, if any, should be taken, nor against whom. And "[a]bsolute safety is not an achievable goal." (Nola M. v. University of Southern, California (1993) 16 Cal.App.4th 421, 436, 20 Cal.Rptr.2d 97.)
Further, the threats made in this case to injure JCC membersdid not convey the kind or degree of the crime actually committeda gunman's attempted murder of children attending Camp Valley Chai. Some threats dated back two and one-half months, and because they were of a general nature and had not been carried out, they could be reasonably deemed to be "crank" calls, empty threats, or threats not directed at the children.
There is no contention that, before the attack, Furrow threatened to harm JCC members or children attending camp. It is not alleged that he made any of the anonymous telephone threats received within two and one-half months of the attack. Furrows armed assault took the North Valley Center completely by surprise.
A general concern about security, absent a sufficiently specific threat, does not require an organization to prepare for the worst imaginable scenario. "[R]andom, violent crime is endemic in today's society. It is difficult, if not impossible, to envision any locale open to the public where the occurrence of violent crime seems improbable." (Ann M., supra, 6 Cal.4th at p. 678, 25 Cal.Rptr.2d 137, 863 P.2d 207.) We live in "a society which appears unable to effectively stem the tide of violent crime." (Nola M. v. University of Southern California, supra, 16 Cal.App.4th at p. 439, 20 Cal.Rptr.2d 97.) But that does not mean security guards must be hired to patrol a summer camp (see Ann M., supra, 6 Cal.4th at pp. 679-680, 25 Cal.Rptr.2d 137, 863 P.2d 207) or that lesser security precautions must be adopted (see Sharon P., supra, 21 Cal.4th at pp. 1195-1199, 91 Cal.Rptr.2d 35, 989 P.2d 121).
And "[t]he type of premises can affect the outcome of a case because the type of duty may vary and each premises has its own physical characteristics that influence the underlying fact situation. The physical layout and nature of a premise have an effect on what a reasonable person should do to protect persons against the criminal acts of third parties. Since each premises has its own unique characteristics, different types of premises will be examined individually." (Bryant, Premises Liability for Criminal Acts of Third Parties: A Negligence Standard (1998) 26 Real Est. L.J. 229, 235.)
Camp Valley Chai occupies an expansive area. The camps openness and easy access are characteristic of camps throughout the country. Many children, especially those living in an urban environment, attend camp precisely because it offers an opportunity to be in the great outdoors. The characteristics of a campchildren engaging in activities such as swimming, sports, field trips, and overnight camping are not conducive to the use of security guards or similar measures.
*404 The circumstances in the present case are not unlike those in McDonald's, supra, 193 Cal.App.3d 495, 238 Cal.Rptr. 436, where a gunman entered a building open to the public and began shooting. As the court there stated, "the unforeseeability of the unique, horrific ... [crime] require[s] negligence liability to be restricted here." (Id. at p. 509, 238 Cal.Rptr. 436.) "Property owners have no duty to prevent unexpected ... crimes." (Nicole M. v. Sears, Roebuck Co. (1999) 76 Cal.App.4th 1238, 1247, 90 Cal.Rptr.2d 922; accord, Thai v. Stang, supra, 214 Cal.App.3d at p. 1273, 263 Cal.Rptr. 202.)
It has been stated that "a greater degree of care is owed to children because of their lack of capacity to appreciate risks and avoid danger.... Consequently, California courts have frequently recognized special relationships between children and their adult caregivers that give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties." (Juarez, supra, 81 Cal.App.4th at p. 410, 97 Cal.Rptr.2d 12, italics added; accord, Ronald S. v. County of San Diego (1993) 16 Cal.App.4th 887, 893-895, 20 Cal. Rptr.2d 418.) But even where liability is based on a special relationship, the potential harm must still be reasonably foreseeable, if not actually known. (See Juarez, supra, 81 Cal.App.4th at p. 411, 97 Cal. Rptr.2d 12; Romero v. Superior Court, supra, 89 Cal.App.4th at pp. 1080-1083, 107 Cal.Rptr.2d 801; Doe 1 v. City of Murrieta, supra, 102 Cal.App.4th at pp. 917-918, 126 Cal.Rptr.2d 213.) Here, the potential harm was not foreseeable or known.
Our nations history contains accounts of hate crimes akin to the one perpetrated at the North Valley Center. In general, such crimes are foreseeable in that they will probably occur as they have in the past. Yet simply because they are foreseeable in this sense should not result in liability for the property owner when they occur. There must be more.

B. Degree of Certainty that Plaintiff Suffered Injury
There is no dispute that Benjamin was injured by Furrow. The claims of Benjamin's parents and brother are derivative: If the JCC is not liable for Benjamin's injury, the other causes of action also fail.[2]

C. Closeness of Causal Connection
Benjamin was wounded because of an alleged lack of security precautions. But the connection between his injury and the lack of security is tenuous. Depending upon Benjamin's location and activity at the time of the shootingwhich were not allegedsecurity measures may not have been of any help. Camp Valley Chai is an expansive campsite where numerous activities are conducted. There is one staff member for every six campers, which, by reasonable standards, appears to be an adequate number of supervisors. Yet, "[i]n some situations, ... reasonable security measures would never have prevented a criminal attack. These circumstances often involve extremely disturbed or determined assailants." (Yokoyama, Danger Zones (Jan.2002) 24 L.A. Law. 45, 49.)

D. Moral Blame
The JCC bears no moral blame. As in McDonald's, supra, 193 Cal.App.3d 495, *405 238 Cal.Rptr. 436, society deplores the act of a deranged gunman and does not blame the property owner. It is unfortunate that bigotry such as Furrows is no stranger to our society.
"Over the past decade, Federal and State legislation has mandated the identification and reporting of offenses known as hate crimes. Today nearly every State and the Federal Government have laws which require sentencing enhancements for offenders who commit hate crimes. These incidents, also referred to as bias crimes, are criminal offenses motivated by an offender's bias against a race, religion, disability, sexual orientation, or ethnicity.... Bias crimes are not separate types of offenses but are crimes against persons, property, or society identified by a specific motivation of the offender." (United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Special Report, Hate Crimes Reported in National Incident-Based Reporting System, 1997-1999, http://www. ojp.usdoj.gov/bjs/pub/pdf/ hcrn99.pdf [as of Oct. 10, 2003].)
"From 1997-1999, sixty-one percent of hate crime incidents were motivated by race, 14 percent by religion, 13 percent by sexual orientation, 11 percent by ethnicity, and 1 percent by victim disability. The majority of incidents motivated by race, ethnicity, sexual orientation, or disability involved a violent offense, while two-thirds of incidents motivated by religion involved a property offense, most commonly vandalism." (National Criminal Justice Reference Service, Hate Crime Resources Facts and Figures http:// www.ncjrs.org/hate_crimes/facts.html [as of Oct. 10, 2003].)
In 2001, of the 9,721 hate crimes motivated by only one type of bias, 44.9 percent were motivated by race, 21.6 percent by ethnicity or national origin, 18.8 percent by religion, 14.3 percent by sexual orientation, and 0.4 percent by disability. (National Criminal Justice Reference Service, Hate Crime ResourcesFacts and Figures http://www.ncjrs.org/hate_crimes/ facts.html [as of Oct. 10, 2003].)
An organization composed of individuals who belong to a "protected" group under hate crime statutes or a business that caters to such a group should not be unfairly burdened to protect those individuals from the criminal acts of third persons. That conclusion was acknowledged in Gray v. Kircher (1987) 193 Cal.App.3d 1069, 236 Cal.Rptr. 891. There, the plaintiff, a gay man, rented a room at a hotel advertising that it was "`under gay management.'" (Id. at p. 1072, 236 Cal.Rptr. 891.) The hotel had permanent and transient residents. One resident, Jerome Meacham, had exhibited an "anti-gay attitude" in his dealings with other residents. (Ibid.) During a confrontation, Meacham shot the plaintiff with a handgun. In a subsequent suit against the hotel owner, the plaintiff sought to base liability, in part, on Meacham's bias against gays. Relying on the Rowland factors (see id. at p. 1073, 236 Cal.Rptr. 891), the court rejected that argument, stating:
"The trial court noted the absence of evidence of any history of violence or assaultive behavior on the part of Meacham, a lack of evidence that [the hotel owner] or anyone else was aware that Meacham possessed a gun, the absence of evidence that [the owner] knew or should have known of any risk to other hotel guests occasioned by Meacham's presence, and a lack of evidence that [the owner] failed to exercise reasonable care to protect [the plaintiff] or other residents.... In short, Meacham's conduct was not reasonably foreseeable.
*406 "Applying the Rowland factors further, we note that [the owners] conduct was without moral blame, and the imposition of a duty to protect against this sort of criminal conduct would place `an extremely onerous burden' on both [the owner] and the community....
"[Plaintiffs] suggestion that [the owner] should have expelled or at least moved Meacham to another part of the hotel because of his alleged `anti-gay' philosophy is untenable. Hotel owners cannot classify and isolate their guests according to their perceived social or political philosophies." (Gray v. Kircher, supra, 193 Cal.App.3d at pp. 1074-1075, 236 Cal.Rptr. 891, citations omitted.)

E. Preventing Future Harm
Imposing a duty in this case would not prevent future harm. The circumstances of Benjamin's injury were unique, shocking and, as stated, unforeseeable. It remains a part of everyday life that people enter and exit unlocked, unguarded facilities operated by various organizations. Children continue to go to camp. Despite the efforts of an organization to protect individuals on its premises, a crazed bigot who has declared "war" on a particular group in society may find a way to breach security measures.

F. Burden on the JCC and the Community
Benjamin was attending summer camp, which is an enriching experience for many children. The operation of a camp is rarely a lucrative endeavor and is often done on a non-profit basis. As stated in a slightly different context, "`... It serves no one to impose a duty which, rather than protecting [others], forces the businesses which they frequent to close.'" (Sharon P., supra, 21 Cal.4th at p. 1194, 91 Cal. Rptr.2d 35, 989 P.2d 121.) "Police protection is, and in our view should remain, a governmental and not a private obligation." (Nola M. v. University of Southern California, supra, 16 Cal.App.4th at p. 437, 20 Cal.Rptr.2d 97.) "[I]mposing a duty to protect against ... shootings would place an onerous burden on [summer camps]." (Thai v. Stang, supra, 214 Cal.App.3d at p. 1273, 263 Cal.Rptr. 202.)
In sum, under the Rowland factors, the JCC did not have a duty to prevent Furrow's attack regardless of whatever security measures were in place. A vicious attack by an anti-Semitic gunman was not reasonably foreseeable under Rowland. The shooting was an unexpected crime. Moral blame lies with Furrow, not the JCC. And if the JCC were subject to liability, similar attacks would remain a possibility, and the financial burden might be onerous, jeopardizing the JCC's positive contribution to the development of children who attend summer camp. Because Benjamin's cause of action for negligence is without merit, so are the others, which are premised on the JCC's alleged breach of a duty to Benjamin.
Our conclusion is supported by the Restatement Second of Torts, which provides: "Since the possessor [of land] is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally *407 or at some particular time, he may be under a duty to take precautions against it, and to provide ... reasonably sufficient [personnel] to afford ... reasonable protection." (Rest.2d Torts, § 344, com. f, pp. 225-256.) Prosser is in agreement. (See Prosser & Keeton, Torts (5th ed.1984) § 61, p. 428.)
The JCC did not know or have reason to know that someone was planning to shoot and kill children attending Camp Valley Chai. Nothing in the JCC's past experience or the place or character of the community center or the camp provided even a hint of what was to come.
In closing, we note that events subsequent to the shooting at the North Valley Center have instilled public fear of criminal acts never before imagined. The Twin Towers in New York City were destroyed in a matter of minutes with great loss of life. The United States Department of Homeland Security issues warnings of possible future terrorist activities. And snipers pick off people who are going about their daily routines.
In this day and age, new threats are often imagined, but the question before us depends upon an application of the Rowland factors to actual threats made prior to Furrow's rampage at the North Valley Center on August 10, 1999. Accordingly, as stated, the JCC did not have a duty to protect plaintiffs from harm.

III

DISPOSITION
The order of dismissal is affirmed.
We concur: SPENCER, P.J., and ORTEGA, J.
NOTES
[1] The last of the Rowland factorsthe availability, cost, and prevalence of insurance for the risk involvedis often not applied, most likely because there is no evidence before the court on the issue, as is the case here, and courts hesitate to engage in guesswork. (See, e.g., Ann M., supra, 6 Cal.4th at pp. 674-680 fn. 5, 25 Cal.Rptr.2d 137, 863 P.2d 207; Romero v. Superior Court (2001) 89 Cal. App.4th 1068, 1090-1095, 107 Cal.Rptr.2d 801; Doe 1 v. City of Murrieta (2002) 102 Cal.App.4th 899, 913-916, 126 Cal.Rptr.2d 213.)
[2] The Kadishes' cause of action for breach of contract alleges that the JCC promised, but failed to provide, a "safe" and "secure" environment. We understand "safe" and "secure" to mean that the JCC would operate Camp Valley Chai in a reasonably safe and secure manner, not that the JCC could prevent the armed assault by the would-be murderer here.